Veterans of America v. VA   Paralyzed Veterans of America v. Secretary of Veterans Affairs Ms. Blouhut. Thank you, Your Honor. Good morning, Your Honor. To me, please, the Court. My name is Linda Blouhut. I represent Paralyzed Veterans of America as a petitioner. And at counsel table with me is Jennifer Sajak, also of Paralyzed Veterans of America. I think the Court is probably well aware this is a well-litigated petition, and we are one of five petitioners in this matter. And so I would like to just spend a few minutes on things that distinguish our petition, our positions. That was going to be my first question. The first, Your Honor, is that we have a broad global concern in the APA test to apply here. The VA and the agency is looking for sort of an isolated, you know, what we're doing is a perfectly rational and reasonable interpretation. And we think there is a broader APA problem here that requires the Court and that the agency should have looked at a greater number of factors, such as the relevant factors is the language we see, the consistency of their behavior, substantiation, the factual basis underlying the rulemaking, which is, of course, a big one for us, because we don't see any factual substantiation of the claims the agency makes, and then other important aspects of the problem. And one thing that I think is very important to remember is that the claims process and the appeals process are part of a continuum. You cannot isolate one from the other. What happens at the claims level will necessarily affect what happens at the appeals level and potentially what ultimately happens in judicial review as these cases work their way through the system and come up to the courts. So even if we're gaining so-called efficiencies which we question at the claims process level, we now have a situation. The VA went to Congress a couple weeks ago with a new budget. They have a 400,000-case backlog at the board level. So an effort to create some systemic change in one part of the system necessarily should be considering all parts of the system. Something that gets you a tiny efficiency over here but gains you no efficiency or creates a greater problem in a later part of your system is not considered important aspects of the problem. Okay, so why wouldn't the efficiencies that are created here translate to over here? Well, I think the backlog that they're talking about is one demonstration. I also think, Your Honor, that there are a lot of unintended- Well, didn't they say that the main purpose or one of the main purposes of this efficiency was to deal with the backlog? Well, it depends on whose backlog you're defining, I think. I think they count a backlog at the front end of the system very differently from how they measure a backlog at the appeals part of the system. So somebody processing a piece of paper or an electronic file faster at the front door does not mean that there's no appeal of that or that those issues aren't considered later, that they don't balloon into an appeal later on. That's just the beginning part of the claim system. But if they are processed more quickly and if they are processed in a way that gives more uniformity, that provides specific details so everybody knows what they're dealing with, wouldn't that also translate to efficiencies at the appellate end? Not necessarily, Your Honor, and I question the premise that everybody knows what they're dealing with. No petitioner in any of these matters opposes standardized forms, and our understanding is that most people do use them, and that's fantastic. However, I think it is important when looking at actions of this agency, certain government agencies are created to dispense a public good, to spread out the resources of the government, and efficiencies in a broad what benefits the government best. Think about the FCC auctioning spectrum or something like that. In those instances, then we can put the efficiency of the government maybe on a higher level. In the case of the VA, the VA is a very different situation. Congress has given individual veterans who meet the criteria, who have served our country, the right to seek certain benefits. If they are entitled, they meet the criteria. So while the VA may distribute those benefits as efficiently as possible, they can't elevate the efficiency over it. It doesn't trump the individual veteran's ability to get their benefit. So if there's something in the claims process, if most are using the forms, fantastic, but you can't leave behind the veteran who doesn't, and that's what we're concerned about here. Didn't they try to accommodate that by allowing people to do something called an intent-to-file scheme, where there's three different ways to notify the VA of your intention to file, and one of them including calling designated VA personnel? Your Honor, I submit, and I apologize for the way this will sound. I know from my personal client base, they've not had past success with calling the VA for things. So offering a telephone line may not calm the concerns of many veterans. The intent-to-file process may be a very, very good process. I'm more concerned about injured veterans in VA hospitals and about veterans who don't file the standard NOD form exactly correctly. And one of our arguments, of course, has to do with 38 CFR 3.157, which is sort of a safety net provision. It's a very, very specific provision that had to do with veterans who were maintained in VA hospitals. Not maintained. Pardon me. Veterans who sought VA health care or had VA hospitalizations. These were veterans who were already service-connected, so their interaction with the system was pretty well established. They were known to the agency. And I apologize. We have an example of a case, and I apologize. I don't have the citation right in front of me. We're happy to provide it, of course. Judge Mormon, just last year, in fact, on March 24th of last year, issued an opinion, a single-judge opinion, describing the functioning of 3.157B, which is what we're talking about. And in that particular case, there was a veteran with a lot of mental disabilities. He was in and out of VA hospitals. And in that, the judge lays out the functioning of the regulation and then remanded it to the board because there was a possibility that the veteran's date of service connection could have an earlier effective date, up to three years earlier, based on his hospitalizations. That has been lost by removing 3.157B, which is what they've done in this rulemaking. They've lost that. Another example, a hypothetical situation that might demonstrate the effect of the loss of this regulation, is a PVA member. We have members with severe disabilities and catastrophic disabilities who are often getting their care from VA. So you have a PVA member, he's service-connected. His service-connected condition is worsening. He begins seeking care in the VA hospital. Say he's hospitalized for six or seven months, and then he passes away. His spouse, prior to March of last year, his spouse would be entitled to a DIC benefit based on the service-connected cause of death. Prior to last March, she would also have been entitled to an accrued benefit, a statutory benefit under 38 U.S.C. 5121, because that hospitalization would have created a pending claim at date of death. Since there can be no more pending claim based on a VA hospitalization, that spouse would not now be entitled to that statutory benefit. So I just want to bring to the Court's attention that there are unintended consequences and other winners and losers, so to speak, in the changes that VA has implemented. So you started out by saying you were going to tell us exactly how these cases differ from the other cases that are pending, and I think you got way off of that. So the first thing you said is that there were global APA issues, but I don't understand how that wasn't raised by the other cases. It may not have been articulated exactly the same way. I think our concern is that the relevant factors be considered that include the consistency of the agency's actions and the history of the statutes. The current situation, we have no statistics on whether this program has been effective or not, how effective it might be without the mandatory nature. We have no idea how many appeals are coming, but I see your point, Your Honor, that these are sort of necessarily included in some of the other petitions. And that's my problem. And I'll ask the other side, the hypothetical the other way, because none of us are on the other panels. So assume, is there just one other panel? There's just one other panel, right? But it's in multiple cases. Yes, there are three petitioners that argued before the other panel. So assume that panel comes out and rules against you and agrees that this was not arbitrary or capricious or that there was a reasonable basis for the change. What is left that you could argue to us where we wouldn't be bound by that determination? Well, Your Honor, that's a good question. I think the 3.157 question was not specifically raised, although if the other panel approves of the entire rulemaking, then we probably have a really interesting en banc petition on all of our hands, right? So given what the other panel, there was a lot of concentration on the informal claims process, the removal of the informal claims process, and I think 3.157. Which would directly address the two problems you just identified. Right, the 3.157 is, because it was one small, it doesn't fall into the huge, like I said, it's a very specific sort of a situation. But I think you're absolutely correct. If the other panel rules first, then we have a very different problem on our hands. Meaning that you would have to go en banc? Yes, we would have to seek an en banc reconsideration. And the best you could get from us is we're bound by them, but we might not have come out the same way? I suppose we could ask you to hurry, maybe? I apologize, Your Honor. That's okay. But yeah, we have ended up, and I have to tell you, speaking only for us, we were unsure how the court would handle this or if we would have the same panel. Did you ask to have the cases consolidated before a single panel? We provided, and I guess the court, of course, is familiar with the DAB case, and I think you had a situation where the two, if I'm getting a little far afield here, the two filers who are here today, we followed DAB to the letter and waited to the effective date of the regulation before filing our petitions. I think the other filers did not do that, and for whatever reason it proceeded in parallel. So we, of course, at each step we all knew there would be related cases, so we didn't file a petition. It says that in the jurisdictional statement in this brief. I don't know whether it says it in the jurisdictional statement of the other briefs, but I did look, but I can't remember. But I guess, but you never filed a motion asking to have them consolidated or to delay the hearing on those? No, Your Honor. No, we did not. Well, obviously we can't delay the hearing at this stage, and I'm honestly not sure what the correct procedural thing would have been to do since all the parties made the clerk's office aware that the cases were related. Okay. Okay, so we'll have to figure that out. But meanwhile, let's hear from the government on this one. Mr. Hockey. May it please the Court? So, yes, the same rulemaking was heard in October in Boston. Did the government attempt to consolidate the various appeals? What happened is, in that case, the Court was informed at various times through motions, although the panel wouldn't have necessarily been informed because the motions obviously take place before the signing. Right, but the clerk's office was. But the clerk's office was informed of the relationship of the parties because what happened here, as Ms. Blahut correctly explained, the first three parties followed the language of 47.3, which indicates that you file your petition within 60 days of issuance of a regulation, whereas PVA and DAV followed this Court's guidance in, I think it was the DAV case, in which it indicated that you could also file within 60 days of the effective date. And here the agency intentionally created a six-month gap between the issuance of the regulation and the effective date to help get up to speed and also hopefully to have resolved any petitions before this Court. So the overlapping briefing took place. We had all consulted, the five, I guess six of us, the government and the five parties, to file some more formal notice when, before the brief, it was almost immediately after the Joint Appendix were filed in the first three, the case was calendared, like, the next month or for the October session. So that sort of took us, you know, off guard. We thought we would have a time of a week or two after we filed the J-8s to get that in because typically the Court's busy and things don't get calendared immediately, but those three cases got calendared immediately. So we, you know, informed the panel up in Boston that these other two cases were in the hopper. All right, so let's proceed with this case. We'll have to see where it takes us because I've been wanting to ask the government, what happens if a noncompliant notice, an O.D., is filed by a veteran? That is just a letter. They got it wrong, the sort of thing that I gather happens from more information. The regulations would provide that if you submit something that's not even on the form, then it won't be recognized. So if someone follows the prior procedure, what happens? Is that person supposed to go to the Code of Federal Regulations and read them and figure out what should have been done? Well, see, what happens is that, and there's an example in the Joint Appendix, or actually in the full record, which the Court asked for, what happens is that the actual document is attached to the decision. So when the person gets the adverse decision from the regional office, attached to the back of it are two pages of instructions telling them how to fill it out and the form itself. So it's provided with the decision. If, for some reason, the VA, and the VA is supposed to, in its own files, note whether they've included this information with the final decision. If the VA does not note that, in other words, if the VA does not include the form with the decision so that the person has it when they get the decision and can fill it out, then that person can just submit a piece of paper, and the VA has to accept it because they didn't serve them with the form. Now, the record, as you know, you responded to our request for the record. Correct. And there is correspondence from veterans saying, what about a homeless person, what about this or that, somebody who is sufficiently disadvantaged to have requested assistance from the VA in the first place. So he gets an adverse decision with a couple of pages of fine print and writes a letter and says, I want to appeal. Do you throw him out because he didn't use the form? That person, the rules would require that eventually that person would have to submit the form. How do you get from there to there? Does he get a response? He will not have, if he submits a plain piece of paper, the folks in the field, I'll clarify, the understanding is that the VA is supposed to notify him that you've submitted the wrong form. But that's not what the regulation specifically provides. There's no duty necessarily, and I'm not trying to suggest that. There is on the ROT. And then you'll argue presumption of regularity, even though the VA can't prove they gave him the form. Well, if the VA can't prove that they gave him the form, then they, by regulation, have to accept the piece of paper. That's plain. How do they prove it? They have to document that when they send out the decision, in their files they have to note that the decision was sent to include the NOD attached to the decision. Is there some box that they check? Is that how it works? It's in the VA's files that they would have a copy of what they sent out. And they would look to see that they sent the decision. And if someone says later that I never got the decision, the VA looks back and can't establish through their records that there was a decision. The regulation says they're allowed to file under 20.201B, which is the old way. But to answer Judge Newman's question, eventually what will happen for the person who has been provided the form but for whatever reason doesn't fill it out and send it back, the determination, they have to at some point file the form. So the VA will have to give it to them or they'll have to get it off the Internet or from a PVA or DAV or somebody. Once that's done, then they're part of the old appeal process. And the board, although the regulations have determined that the board no longer will review whether something is adequate if the person has been provided the form, they still retain the authority to determine timing. And as part of that, they use the full panoply of tools at their disposal to determine whether somebody is delayed because they weren't provided the right form. They're still able to do that under the regulations. So you agree that all the timelines in the regulations for purposes of the veterans' filings are subject to equitable tolling? I agree that the Supreme Court in Henderson has tolled 7266, which is the statute, obviously the Court is aware, for appeals to the Veterans Court. I don't believe there's a decision yet by anybody with respect to this particular time period. I would not want to bet against the application of tolling on the NOD. Well, what's the VA's position? We would have to brief that should that issue arise. And I believe Henderson would be very instructive in our briefing process, but I don't think we've formed a position as to whether or not it's tollable. Now, what happened to the Houston pilot study? That wasn't included in the record that we received. The Houston pilot study was, for a period of time, the VA added the Notice of Disagreements to the decisions to see if people would return them, actually use them. But it was non-mandatory because they couldn't make it mandatory because they needed a rule to make it mandatory, so they did that. And they compiled the results of that, indicating that around 50% or so of the folks who got these NODs returned them without even being told that they had to return them. Now, how come that wasn't included in the record? Was that an oversight? We attempted to find some documentation at a summary level, but couldn't. We considered trying to determine whether we would, and I apologize, we actually had this conversation, determine whether the best way to prove it would be to provide all of the decisions and all of the Notice of Disagreements. But we felt that was simply, first of all, the decision makers in this process never had any of that information. That was the source material. And it would have been highly burdensome because it would all have been heavily redacted because it's all personal to each individual veteran. So we didn't include that source material, like I said, primarily because the decision makers didn't rely on the actual documents. But the decision makers did rely on the Houston study. Well, the decision makers had the study, yes,  You said it was not mandatory in Houston, and therefore how could that have shown what would have happened if it had been mandatory? I think the concerns were, well, the reason, first of all, let's step back, the rationale behind this is efficiencies gained from using standardized forms. That, the VA believes, is intuitive. We do it all the time. In fact, in the military especially, is an occupation related to forms. From the day you start, you fill out a form, to the day you leave, you fill out a form. So the concept of gaining efficiencies through the use of standardized forms wasn't one that I don't think anybody needed to necessarily verify through some kind of study. But the VA did go ahead in the NOD context and send these things out to see whether people were able to fill them out and send them in. So it was helpful. The concerns that have been raised, here you have an organized group of regional offices in Houston and another structure, but now that this is going to be nationwide, according to the popular press, there is a shockingly large number of homeless veterans who therefore wouldn't get the mail, wouldn't know that they have to consult the Federal Register and get a form and all the rest of it. And that's why I asked, what happens if, in fact, they manage to cross this transition of letting the VA know that they think that there was a mistake, something rather wasn't considered or something has gotten worse or whatever, and they don't, let's say the VA says, here, fill out this form and they don't get the mail, are they out on the street again? At present, as I understand it, there is a conscious effort, affirmative effort to assist, to find, to fill the gaps, to facilitate the veterans of filing the claims that they feel that they ought to be filing. And the bit of the record that you sent us has commentary, some comments saying, yes, the form is great, makes it easier, and commentary saying it's bad enough as it is, and now you're imposing two pages of fine print and so on. If the question in my mind is that if, in fact, there is, I don't want to say a reasonable chance, enough of a chance that this is affecting veterans adversely, how is the VA responding to that? Well, first of all, let me answer that question first, Your Honor, because it's often the case, the VA is in the mission of helping veterans. So certainly if the statistics would show, after having this now been implemented a year, actually, because it was implemented last March, that people were having issues communicating with the VA because of this change, then the VA would do something about it. That is our mission. Our mission is to help the veterans. We're not interested in depriving veterans of access to the VA. We're interested in trying to help them. I will respond to the predicate of your concerns about homeless veterans and other situations like that, in that all along there is an element of having to have an ability to tell the VA where you are so that the VA can communicate with you. In other words, even under the old system, you needed to have a mailbox address so that the VA could send you the decision, and you needed to have access to the Postal Service so that you could send them your communications. So the standardized forms doesn't change that. You still go to your Postal Service, and you get the form. The VA is attached to the document, and you fill it out, and you send it back through the same Postal Service. Yes, and we have seen those cases. Generally they arise in the context of retroactive dates, whether some lost notice or lost mail can eventually inure to the benefit of a veteran. Yes, in those cases what happens is at some point in the process, the veteran had a mailbox address and was communicating with the VA, and then yes, the veteran goes off the grid, so to speak, and doesn't prosecute the claim because of their conditions, real conditions. We're not minimizing them at all, and then comes back later. And yes, there are cases and laws that are available to the veteran to try to help that veteran obtain the most maximum benefits possible under the system, given everything else, the constraints and whatnot. Those things, like has been suggested in all five petitions about this court's Roberson decision or Comer decision, none of those cases are affected here. The duty to assist, the duty to help, all those things survive this rulemaking. This rulemaking is simply about trying to make it easier for, in some respects really it is, easier for the veteran. To go back to your example, Judge. Let me give you an example. We recently had a case where the veteran claimed stomach problems, and the VA took the opinion that that didn't include irritable bowel syndrome. But a veteran doesn't necessarily know what a specific diagnosis is. So what if the veteran writes stomach problems on this form? Could the VA now say that anything that doesn't fall within just a very small version of generic stomach problems is now completely excluded because the form- No. No. No. And once again, no. The reference that all five petitioners rely upon in the rulemaking, in the commentary, was to distinguish between the situation in which somebody comes in who is seeking benefits, has filed a claim for a need condition, and they may just describe it as a need condition. And that's another part of the record we've explained, that in the specificity part for the NOD, which was challenged and discussed up in Boston, you're not required to identify, I have a medial lateral slight tear of the left or the ligament or whatever. I don't even know, although I had that happen once. But all you have to do is say, I have a knee problem. And whatever it is that's causing a knee problem is within the scope of what the VA is supposed to do to try to figure out what's wrong with you. I know the case you're talking about, Your Honor, and there was some argument about some medical reason why irritable bowel syndrome was unrelated to the stomach that's beyond me. But the point of this regulation is that, no, those requirements, including the case you referenced, apply to the VA's development of claims. Now, what's different, and this is what the comment was, that doesn't mean that somebody who comes in and says, files a claim for knees, and is having it adjudicated and developed. And as part of that adjudication says, my private doctor has some documents, here, go get them, as the VA does under 5103 capital A. They go out and ask the doctor, could you please bring me the medical files for patient Doe. Those medical files come in and they're all about the knee, and then there's this one document where a claimant, Doe, went in five years earlier to complain about his shoulder. There's no claim for a shoulder. There's never been any suggestion by the claimant that he's ever seeking any relief from the shoulder. What the VA was concerned about was that would put some onus on the VA to somehow create a claim for shoulders when there had been no claim made. Going back to how Judge Mayer described the original NOD years ago, that hasn't changed. You have to have a claim for something. If it's the knee, the VA is going to figure out what's wrong with your knee. If you don't know how to describe it, they're going to figure out how to describe it, and they're going to compensate you for it to the extent it's related to your service. That doesn't mean that simply through the process of development where something comes in and it has absolutely nothing to do with your claim or can't be arguably related to your claim. If it could be arguably related to the claim, then it would be within the scope. But if it can't be, then the VA doesn't have a duty at that point to somehow have done something with respect to that extraneous reference. That's sort of the genesis of the comment, and everyone thought, I think, in the briefing, that what VA was trying to do was walk away from Roberson and Comer, and we aren't. And we said that before. So if a veteran is suffering from multiple disabilities and doesn't know what all of them are, they've really at least got to get in the ballpark? The development, they have to come in. I mean, I think most veterans know. They can describe what's bothering them. I mean, something's wrong with me. My legs aren't working or my heart beats weird. That's all they have to do is to identify what it is. In many of these cases, they'll have been to the doctor and had some sort of diagnosis about whatever it is that they have. And those folks obviously can just state, well, I went to the doctor and he says I have this, and I think it's related to that time I jumped out of the airplane. That's the level that we're at here, which these are distinguished members of our military, and they've been through this, and they can usually tie what it is that they're complaining about. Now, folks who are undergoing mental problems, having mental issues, that's always going to be a challenge for everybody on both sides. And hopefully they have help, but when they don't, and articulating the claims, when they don't, the VA tries to go in and help them figure out what it is exactly. The next case, as announced, is on the same subject matter, except that we have a different appellant. I know that you're defending both, and we have, I think, overlapped in our questions. So let's move on to the next question, as brought by the disabled veterans. And the difference between them, as far as we could tell, is that we concentrate in this case on whatever the impact of the Houston pilot study might have been, and then to talk some more about the effect on vulnerable veterans. So let's proceed with the bit of rebuttal that concentrated, perhaps, on the Houston pilot study, and then we'll go on to the next case and ask you the rest of the questions that we'll think of between now and then. Okay, so Ms. Blau, I'll give you five minutes for rebuttal. Thank you, Your Honor. I think we've established that there's really not much to look at with the Houston study, because whatever study was produced that the people promulgating this rule looked at has not been made available to the rest of us. Was there a request for it, or do you read the APA rules to say that it must just always be produced, regardless of a request? Well, I guess when we saw the rulemaking record, we would have assumed it was part of the information that the agency had considered in the rulemaking and would have been presented. I know that members of Congress apparently have requested it, and it has not been provided to them either. So I honestly have no information on what the status of it is, except that we don't know how many claims. There are all those normal questions that you might have to check your data against. We have no way to answer them because we don't know what the raw numbers were or what the report was that was provided. I can tell you from our Houston service officer, however, that they have monthly meetings, apparently, in Houston, and apparently there has not been any great improvement in the processing numbers in Houston itself, which I thought was sort of interesting. Just to get back to a moment, though, on the differences amongst our petitions, I do want to clarify, our petition did not cite the Roberson or Comer-Lyneth cases. I would like to go back to your question, Judge Newman, about what about the veteran who doesn't get the form or who doesn't file the form. The form is in the joint appendix at 295, beginning at 295. And under the new regulation, 19.24B4, either a veteran who does not file the form or a veteran who files the form but maybe the VA still has some confusion about it and does not refile the form, that claim will become final under that provision. So final and unappealable. And this brings me to one other thing that distinguished our petition from others. Obviously, we pride ourselves on our representation of our members and other veterans nationwide. And the use of this form has created, I'll call it an unforeseen consequence, where the VA, in order to clarify the form, is contacting represented veterans without contacting their representatives and then either modifying their appeals and, in some cases, withdrawing their appeals. Unofficially, I've spoken to attorneys who practice in this area as well. And apparently, it doesn't matter whether the veteran is represented by a VSO or by an attorney within the system. So you have sort of this off-the-record ex parte contact going on, which then may change the course of the appeal. Now, the stories I've heard about from my service officers, or the instances, I should say, in those cases, the service officer has been able to go back to regional office personnel and either reinstitute the appeal or get the appeal back in the correct status as the veteran proceeds through their claim. But we want to bring that to the court's attention because I think this VA does a lot in a lot of areas a lot of times. This rulemaking was overlapped with another rulemaking for what they call the Regulation Rewrite Project. So there's always a huge agency. There's always a lot going on, which I think also means that maybe sometimes things get lost in the haste to do things in a particular way. And so these are the issues we wanted to bring to the court's attention because I think they were either overlooked or unintended, yet I believe they are important to how veterans are able to prosecute their claims and appeals. And if the court has no further questions, we ask that the petition be granted. Okay. Thank you. Thank you.